# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEANETTE HOSKINS,<br><br>        Plaintiff,<br><br>     v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>        Defendant. | Case No. 1:17-cv-01520-LJO-SAB<br><br>FINDINGS AND RECOMMENDATIONS RECOMMENDING GRANTING PLAINTIFF'S SOCIAL SECURITY APPEAL AND REMANDING FOR FURTHER ADMINISTRATIVE PROCEEDINGS<br><br>(ECF Nos. 15, 23, 24)<br><br>OBJECTIONS DUE WITHIN FOURTEEN DAYS |

## I.

## INTRODUCTION

Plaintiff Jeanette Hoskins ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for disability benefits pursuant to the Social Security Act. The matter was referred to a United States magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302.

Plaintiff suffers from degenerative disc disease of the lumbar and cervical spine, obesity, a bone spur on the right foot, and plantar fasciitis. For the reasons set forth below, the Court recommends that Plaintiff's Social Security appeal be granted.

///

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

On February 27, 2014, Plaintiff filed a Title II application for a period of disability and disability insurance benefits, and on March 7, 2014, filed a Title XVI application for supplemental security income. (AR 20, 121, 241, 243.) While the applications specified an onset of disability date of December 20, 2013, Plaintiff requested the onset date be amended to February 27, 2014. (AR 20, 47.) Plaintiff's claims were initially denied on June 19, 2014, and then denied upon reconsideration on October 15, 2014. (AR 20, 167, 177.) On May 19, 2016, Plaintiff appeared for a hearing before Administrative Law Judge Ross G. Wheatley (the "ALJ"). (AR 36-75.) On July 15, 2016, the ALJ found that Plaintiff was not disabled. (AR 17-33.) On September 19, 2017, the Appeals Council denied Plaintiff's request for review. (AR 1-4.) Plaintiff filed an unsigned complaint with this Court on November 13, 2017, which was stricken and then refiled on November 15, 2017. (ECF Nos. 1, 2, 4, 5.)

### A. Relevant Hearing Testimony

Plaintiff appeared with counsel and testified at a May 19, 2016 hearing. (AR 41-71.) Plaintiff testified that she was fifty-three years old, five feet three inches tall, and weighed 215 pounds on the date of the hearing. (AR 44.) She attended some high school up to the ninth grade, but did not graduate. Plaintiff has not attended adult education classes, received a GED, nor completed any specialized occupational training. (AR 44-45.) Plaintiff has basic reading and math skills, but struggles with more difficult subject matter. (AR 45-46.)

Plaintiff initially answered that she had not worked since 2013, however counsel clarified that Plaintiff's onset date for Title II benefits should be amended from the original date of December 20, 2013, to February 27, 2014, due to employment earnings in January of 2014. (AR 46-48.) Plaintiff took a leave of absence in January of 2014 because of back problems and sharp pains down the legs, and was unable to return. (AR 48-49.)

Plaintiff confirmed that she has degenerative disc disease affecting her lumbar spine, cervical spine, along with a bone spur on the right foot, and plantar fasciitis. (AR 49.) Plaintiff testified that her lower back causes her the most problems, that she experiences sharp pains, and

sometimes cannot sit for certain periods of time, necessitating her to stand after as little as fifteen minutes. (AR 50.) Plaintiff stated her back pain radiates through both sides of her body, that the left side "always" gives her bad cramps, and she "can't move." (AR 55-56.) The pain also extends to her legs. (AR 56.)

Plaintiff sees Dr. Ereso, who referred her to Dr. Tate for an epidural steroidal injection. (AR 50-51.) Plaintiff stated she was "hurting worse" after the first injection, and that she was planning on completing a walk-in visit to inform Dr. Tate about the status. (AR 51-52.) She has had two or three total injections. (AR 53.)

Plaintiff attended physical therapy in 2014 for her back pain, but stated it did not help or make any noticeable difference. (AR 52.) She "[t]ried to" complete the home exercise program suggested by the physical therapist, however it also didn't help. (AR 52-53.) She does the suggested exercises "[m]aybe once a day," as recommended. (AR 53.) Plaintiff does not wear a back brace. (AR 53.) Plaintiff has not attempted hydrotherapy. (AR 53.) Her current doctor did not recommend an additional stretching routine. (AR 56.)

Plaintiff takes medication that eases the pain compared to when she does not take the medication, however the pain is still present. (AR 53-54, 56.) She visited the doctor for her foot problems the year before the hearing, and also two weeks before the hearing. (AR 54.) The doctor gives her injections in her foot that do help. (AR 54.) When Plaintiff had insurance, she would go approximately three times a year for her foot pain, however now that it is more expensive she does not. (AR 54-55.) Plaintiff has health care through the Affordable Care Act, but it doesn't cover the payments for the foot doctor. (AR 55.) When asked, Plaintiff stated she hadn't looked at other free care options such as through county services. (AR 55.)

Plaintiff testified that she helped care for her husband after he had a stroke, however her daughter was there to help out, but "at night time I have to do the best I can with him and stuff . . . [a]nd then he got in-home care." (AR 57.) When the ALJ asked what type of help she provided her husband in the 2014 time period, Plaintiff stated she did not have to help lift him or help him walk, and did not have to help him bathe or get dressed. (AR 57-58.)

In a typical day, Plaintiff can bathe and dress herself, though on bad days it takes longer

to do so. (AR 58.) Plaintiff can prepare basic foods, such as eggs and sandwiches for herself or husband. (AR 59.) Plaintiff can perform basic household chores, such as picking up the house, making the bed, loading the dishwasher, and vacuuming, however will take breaks or sit if her back gets tired. (AR 59.) An in-home care worker assists with the laundry, however Plaintiff tries to do it on her own sometimes. (AR 60.)

Plaintiff spends a few hours a day watching television, and reads the bible sometimes. (AR 61.) She does not know how to use a computer, though her family member created an email address for her, and she owns a cell phone. (AR 62.) The cell phone has internet, and uses the voice to text feature to send text messages. (AR 62.) Plaintiff states she goes shopping maybe once a month. (AR 62-63.) Plaintiff drives about three times a week, sometimes to her or her husband's medical appointments, though someone drove her to the hearing because of her back pain. (AR 63.) The longest distance she drove in the past year was from Modesto to Stockton. (AR 64.) Plaintiff visits her mother about three times a week, who lives very close. (AR 64-65.) She does not go out to restaurants or other things with friends, nor attends church because of the longer period of sitting. (AR 65.)

Plaintiff has tried to stick to a healthy diet in line with her doctor's recommendation to lose weight and exercise. (AR 66.) When trying to walk for exercise, Plaintiff can walk for about ten minutes, and then stops to rest for about fifteen minutes. (AR 66-67.)

When examined by her attorney, Plaintiff emphasized that her neck pain is also very bad, which causes headaches, and that she has sharp pains that extend through her left side to her shoulder and arm, affecting her ability to reach out or upwards. (AR 67-68.) Plaintiff stated she sometimes has issues moving her head, and then clarified it is "[m]ost all the time," when asked by her attorney. (AR 68.) Plaintiff has about six (6) headaches per month which last about two hours. (AR 68-69.) Plaintiff also has sharp pains in her left wrist, however when asked if her doctor ever performed a nerve conduction test, she replied no. (AR 70.) Plaintiff stated the doctor told her it might be carpal tunnel syndrome, and that she plans on looking into further treatment. (AR 70-71.) The wrist pain sometimes affects her ability to hold grip items, however the pain is not as bad as her back or neck. (AR 71.)

1    Plaintiff's doctors did not refer her to a physical therapy traction session, nor did they

2    perform a CT or MRI scan of her brain to determine the type of headaches.  (AR 71.)

3        A vocational expert, Lorian I. Hyatt (the "VE"), also testified at the hearing.  (AR 72-78.)

4    The VE summarized Plaintiff's past work as a housekeeper, 381.687-014, heavy with an SVP:2,

5    and also as a motel maid, 323.687-914, light with an SVP:2, though the records indicated she

6    was required to lift up to fifty pounds, which would place the work in the medium category as it

7    was performed.  (AR 73.)

8        The first hypothetical person presented by the ALJ to the VE was a person of Plaintiff's

9    age, education, and work experience capable of performing at the light level, which the ALJ

10   defined as standing or walking for approximately six hours during an eight-hour day, and sitting

11   up to six hours during an eight-hour day with normal breaks.  (AR 74.)  The hypothetical would

12   entail occasional ladders, ropes, scaffolds, ramps stairs. stooping, crouching, kneeling and

13   crawling.  Overhead reaching limited to occasional bilateral, handling as gross manipulation

14   limited to frequent bilaterally.  Fingering limited to frequent bilateral.  (AR 74.)  The VE stated

15   that the Plaintiff would be able to perform the motel maid job as traditionally performed, but not

16   specifically as previously performed based on the record's indication that she was required to lift

17   fifty pounds.  (AR 74.)  The VE stated that such a hypothetical person could perform other jobs

18   in the economy, including inspector, 559.687-074, light with an SVP:2, with 250,000 such jobs

19   available nationwide. (AR 75.)   The VE also stated such a person could perform the job of

20   interviewer, 205.367-054, light with an SVP:2, with 200,000 such jobs available in nationwide.

21   (AR 75.)

22       The second hypothetical person presented by the ALJ was the same as the first, but with

23   the additional limitation of requiring a sit/stand option provided the worker would not be off task

24   more than ten percent (10%) of the work period.  The VE testified that such person would not be

25   able to perform Plaintiff's past work because the sit/stand option is not readily available for a

26   hotel maid.  (AR 75.)  The other two jobs available to the first hypothetical person would be

27   available, however the labor market would be eroded fifty percent (50%) for interviewer, and

28   seventy-five percent (75%) for inspector.  (AR 75.)

For a third hypothetical, the ALJ proposed such person would likely have three or more unexcused absences per month, in addition to the limitations of either hypothetical person number one or two. (AR 76.) The fourth hypothetical person would have the same limitations as either number one or two, and would also require breaks every two hours for ten minutes in addition to regular breaks. The fifth hypothetical person would have the same limitations as either number one or two, and would also be unable to engage in sustained work activity on a regular continuing basis for eight hours a day, five days a week, for a forty-hour work schedule. (AR 76.) The VE testified that there would be no jobs for hypothetical persons number three, four, or five. (AR 76.)

**B.    ALJ Findings**

The ALJ made the following findings of fact and conclusions of law:

- Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2018.

- Plaintiff has not engaged in substantial gainful activity since December 20, 2013, the alleged onset date.[1]

- Plaintiff has the following severe impairments: degenerative disc disease of the lumbar and cervical spine, and obesity.

- Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.

- Plaintiff has the residual functional capacity to perform light work with the following additional limitations: The Plaintiff can stand or walk six hours and sit six hours during a normal eight-hour workday, with normal breaks. The Plaintiff requires a sit-stand option allowing her to sit or stand alternatively at will provided that she is not off task more than 10% of the work period. The Plaintiff can occasionally climb ladders, ropes, scaffolds, ramps, or stairs, and can occasionally stoop, crouch, kneel, and crawl. The Plaintiff can occasionally reach overhead, frequently handle objects (gross manipulation), and

---

[1] While Plaintiff initially specified an onset of disability date of December 20, 2013, at the hearing, Plaintiff requested the onset date be amended to February 27, 2014. (AR 20.) The ALJ found that Plaintiff worked after December 20, 2013, but the earnings records showed less than substantial gainful activity for 2014. (AR 22.)

frequently finger (fine manipulation of items no smaller than the size of a paper clip) with bilateral upper extremities.

- Plaintiff is unable to perform any past relevant work.

- Plaintiff was born on April 8, 1963, and was fifty years old which is defined as an individual closely approaching advanced age, on the alleged disability onset date.

- Plaintiff has a limited education and is able to communicate in English.

- Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Plaintiff is not disabled, whether or not Plaintiff has transferable job skills.

- Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

- Plaintiff has not been under a disability, as defined in the Social Security Act, from December 20, 2013, through the date of the ALJ's decision.

(AR 22-33.)

### III.

### LEGAL STANDARD

To qualify for disability insurance benefits under the Social Security Act, the claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." See 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations set out a five-step sequential evaluation process to be used in determining if a claimant is disabled. 20 C.F.R. § 404.1520; Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1194 (9th Cir. 2004). The five steps in the sequential evaluation assessing whether the claimant is disabled are:

Step one: Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.

Step two: Is the claimant's alleged impairment sufficiently severe to limit his or her ability to work? If so, proceed to step three. If not, the claimant is not disabled.

Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the claimant is disabled. If not, proceed to step four.

Step four: Does the claimant possess the residual functional capacity ("RFC") to perform his or her past relevant work? If so, the claimant is not disabled. If not, proceed to step five.

Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow him or her to adjust to other work that exists in significant numbers in the national economy? If so, the claimant is not disabled. If not, the claimant is disabled.

Stout v. Commissioner, Social Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

Congress has provided that an individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits. 42 U.S.C. § 405(g). In reviewing findings of fact in respect to the denial of benefits, this court "reviews the Commissioner's final decision for substantial evidence, and the Commissioner's decision will be disturbed only if it is not supported by substantial evidence or is based on legal error." Hill v. Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012). "Substantial evidence" means "more than a scintilla . . . but less than a preponderance." Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal quotations and citations omitted). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002) (quoting Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

"[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." Hill, 698 F.3d at 1159 (quoting Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006) (internal quotations and citations omitted). However, it is not this Court's function to second guess the ALJ's conclusions and substitute the court's judgment for the ALJ's. See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.").

# IV.

## DISCUSSION AND ANALYSIS

### A.    The Parties' Arguments

Plaintiff's main contention is that the ALJ failed to follow the treating physician rule in affording little weight to the opinion of Dr. Ereso, and instead relied on "dated opinions from nonexamining sources, leaving his decision unsupported by substantial evidence."   (Pl.'s Opening Br. ("Pl. Br.") 5, 12, ECF No. 15.)  She argues the ALJ's determination that Dr. Ereso "relied heavily on the subject report of symptoms and limitations . . . was unsupported by the evidence," and therefore improper as a factor in assigning little weight to the opinion.  (Pl. Br. at 13-14.)  Plaintiff highlights the fact that "Dr. Ereso ordered all of Plaintiff's medical imaging, and noted explicit reviews of at least most of them . . . [and] [t]he medical imaging undoubtedly supports Dr. Ereso's limitations.  (Pl. Br. at 14.)  Plaintiff also contends that the non-examining physicians reviewed less medical evidence than Dr. Ereso in formulating their opinions, given that the state agency opinions did not have access to the most recent MRIs and two opinions from Plaintiff's treating physician.  (Pl. Br. at 19.)  In sum, Plaintiff argues that the ALJ should have given more weight to the "well-reasoned and fully explained opinions provided by Dr. Ereso," rather than relying on "the unsupported and non-examining opinion of State agency physicians," which resulted in the VE being presented with an "incomplete hypothetical question" and the VE incorrectly testifying that someone with Plaintiff's condition could perform work in the national economy, including inspector and interviewer.  (Pl. Br. at 19.)

Defendant argues that the ALJ addressed every medical assessment form provided by Dr. Ereso and explained each basis for discounting Dr. Ereso's medical opinion, and his reasoning was supported by substantial evidence.  (Def.'s Opp'n Pl.'s Opening Br. ("Def. Opp'n") 5, ECF No. 23.)  Defendant maintains it was proper for the ALJ to question the strength of Dr. Ereso's opinion given it appeared to be based on Plaintiff's subjective complaints rather than objective medical evidence to support the conclusion.  (Def. Opp'n at 7.)  Defendant further argues that the ALJ properly rejected Dr. Ereso's opinion because it was not supported by the medical evidence and was contrary to Plaintiff's admissions regarding her abilities, and although her condition

may have prevented her from returning to her previous work as performed, she could find work in the national economy within her limitations. (Def. Opp'n at 7-8.) Finally, Defendant also argues that the ALJ gave greater weight to the non-examining state agency physicians because they were supported by substantial evidence and more consistent with the record as a whole. (Def. Opp'n at 10-11.)

**B.    The ALJ did not Err by Assigning Little Weight to Dr. Ereso's Opinion**

The weight to be given to medical opinions depends upon whether the opinion is proffered by a treating, examining, or non-examining professional. See Lester v. Chater, 81 F.3d 821, 830-831 (9th Cir. 1995). In general a treating physician's opinion is entitled to greater weight than that of a nontreating physician because "he is employed to cure and has a greater opportunity to know and observe the patient as an individual." Andrews v. Shalala, 53 F.3d 1035, 1040-41 (9th Cir. 1995) (citations omitted). If a treating physician's opinion is contradicted by another doctor, it may be rejected only for "specific and legitimate reasons" supported by substantial evidence in the record. Ryan v. Commissioner of Social Sec., 528 F.3d 1194, 1198 (9th Cir. 2008) (quoting Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005)).

Where the treating physician's opinion is contradicted by the opinion of an examining physician who based the opinion upon independent clinical findings that differ from those of the treating physician, the nontreating source itself may be substantial evidence, and the ALJ is to resolve the conflict. Andrews, 53 F.3d at 1041. However, if the nontreating physician's opinion is based upon clinical findings considered by the treating physician, the ALJ must give specific and legitimate reasons for rejecting the treating physician's opinion that are based on substantial evidence in the record. Andrews, 53 F.3d at 1041.

The contrary opinion of a non-examining expert is not sufficient by itself to constitute a specific, legitimate reason for rejecting a treating or examining physician's opinion, however, "it may constitute substantial evidence when it is consistent with other independent evidence in the record." Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001). The ALJ need not accept the opinion of any physician that is brief, conclusory, and unsupported by clinical findings. Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002).

1          1.      Dr. Ereso's May 9, 2014 RFC Questionnaire

2          The ALJ reviewed a RFC questionnaire completed by Dr. Ereso on May 9, 2014.  (AR

3   28-29, 439-42.)   Dr. Ereso's form noted the following: 1) that Plaintiff's symptoms are

4   "constantly" affecting her ability to perform simple work-related tasks; 2) drowsiness, dizziness,

5   and constipation as side effects of medication impacting her capacity to work; 3) that Plaintiff

6   would need to recline or lay down during an eight-hour workday in excess of normal breaks; 4)

7   she can walk one block without rest or significant pain; 5) can sit for forty-five minutes and

8   stand/walk for thirty minutes at one time; 7) can sit for five hours or stand/walk for five hours

9   during a normal eight-hour work day; 8) Plaintiff needs a job which permits shifting positions at

10  will from sitting, standing or walking; 9) needs fifteen to thirty minute breaks every one to two

11  hours; 10) can lift and carry less than 10 pounds frequently, 10 to 20 pounds occasionally, and 50

12  pounds never; 11) no limitations in reaching, handling or fingering; 12) will be absent three or

13  four times a month; 13) and Plaintiff is not physically capable of working an eight hour day, five

14  days a week on a sustained basis.  (AR 439.)

15         The ALJ assigned little weight to Dr. Ereso's May 9, 2014 opinion, stating that "[w]hile

16  the exertional limitations for lifting and carrying are supported by the medical record, the doctor

17  did not provide any explanation for the conclusion that the claimant was limited to four hours in

18  sitting and standing or walking, or that the claimant could not work full time, or why she needed

19  to lie down and take unscheduled rest breaks."  (AR 28-29.)  The ALJ also found that "[t]he

20  check-box form did not explain why a person could perform light work with no postural or

21  manipulative limitations indicated, but that the person could not work a normal eight-hour

22  workday five days a week."  (AR 29.)

23         Medical exam records from the period preceding the RFC questionnaire ranging from

24  March 19, 2013 to February 27, 2014, support the ALJ's finding.  (AR 379-402.)  On March 19,

25  2013, there were no musculoskeletal physical exam notes aside one regarding heel pain.  (AR

26  401-02.)  On April 22, 2013, there were no musculoskeletal physical exam notes, and the doctor

27  noted that Plaintiff refused an epidural injection for pain in her neck and lower back.  (AR 399-

28  400.)  On June 13, 2013, the musculoskeletal physical exam notes only state "normal back."

(AR 397-98.) On August 8, 2013, there were no musculoskeletal physical exam notes. (AR 395-96.) The October 8, 2013 exam does note "chronic low back pain due LS DDD which bother[s] a lot," and also notes "afraid to have epidural injection." (AR 390-92.) An exam record dating November 5, 2013, states that Plaintiff hurt her right ankle moving furniture. This exam also notes under the neck physical exam that there is "cervical spondylosis with left radiculopathy pain level mostly 8/10 sometimes up to 10/10," noted that patient is afraid to have an epidural done, and also noted normal gait, station and stability. (AR 387-89.) On January 8, 2014, there was a straight leg test with 30 degrees bilateral with lower back pain, and notations regarding the findings from the December 28, 2013 MRI, which were evaluated by the ALJ and agency physicians, as discussed below. On February 4, 2014, the exam notes reflect straight-leg testing of 90 degrees bilaterally with pain on the right, and noted "limp on the right side." (AR 381-82.) Aside from these, there were no other musculoskeletal findings in these exam records noted by Doctor Ereso. (AR 379-402.)

Additionally, the RFC questionnaire itself includes no explanation or basis for the limitations. In fact, questions 1-4 are blank, including: "2. Diagnosis," "3. Prognosis," and "4. Identify all of your patient's symptoms," and there are no clinical findings or objective signs listed or referred to on the form. (AR 439-40.) Dr. Ereso also states that the Plaintiff has no limitations in reaching, handling, or fingering, which changes in subsequent RFC questionnaires, without apparent explanation, as discussed further below.

The Court finds the ALJ reasonably determined that while the records supported the exertional limitations, the other specified severe limitations were not adequately supported by objective findings reported in the questionnaire or exam records preceding the questionnaire. The ALJ need not accept the opinion of any physician that is brief, conclusory, and unsupported by clinical findings. Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002). While Plaintiff does suffer from objective medical ailments such as degenerative disc disease, as shown by the MRI and examinations, and which the ALJ and agency physicians accepted, the ALJ did not err in giving little weight to the ultimate conclusions of the May 9, 2014 RFC questionnaire.

The ALJ reviewed the lumbar MRI conducted on December 28, 2013, a short time prior

to the May 9, 2014 RFC questionnaire. (AR 26, 416.) The MRI showed there had been "progressive severe discogenic disease at the L4-L5 greater than L3-L4" since a previous MRI in 2007, that there was "corresponding mild levocurvature of the lumbar spine centered upon L3, L4, and L5," an "annular bulging extending into the left lateral recess with mild intrathecal root mass effect left L3-L4 and right L4-L5," a "moderate distal left foraminal stenosis at L3-L4 and L4-L5 and L5-S1," and a suspected "mild mass effect upon the exiting left L3 foraminal root at L3-L4." (AR 416-17.) The December 28, 2013 MRIs are only referred to one time in Dr. Ereso's examination notes prior to the May 9, 2014 RFC questionnaire, simply noting the results on January 8, 2014 (AR 383-84), after recommending such MRIs on December 17, 2013 (AR 385-86). Regarding the lumbar MRI, the ALJ found that it demonstrated "an objective medical condition that would likely cause some level of pain, but not of the severity, intensity, or frequency as alleged by claimant," and that the RFC finding "adequately accommodates any limitations the claimant may have due to degenerative disc disease."[2] The ALJ's assessment of the MRI is supported by the state agency medical consultants' opinions, whose review included the December 2013 MRIs, and found that the totality of the evidence does not support the greater limitations opined by Dr. Ereso on May 9, 2014. (AR 122-130, 143-152.)

The ALJ also noted that "[i]t appears that the doctor completed the form relying primarily on the claimant's report of symptoms rather than based on an examination and resulting findings by the doctor." (AR 29.) An ALJ can reject a treating physician's opinion for the specific and legitimate reason that such opinion is based on a claimant's "subjective complaints," that have been "properly discounted." Fair v. Bowen, 885 F.2d 597, 605 (1989). The state agency medical consultants' opinions, specifically found that Dr. Ereso's opinion "relies heavily on the subjective report of symptoms and limitations provided by the individual, and the totality of the evidence does not support the opinion." (AR 122-130, 143-152.) Further, as explained

---

[2] The record shows that Plaintiff also received a cervical MRI on December 28, 2013. (AR 418-19.) This was not cited directly in the ALJ opinion, and showed a "[c]hronic diffusely abnormal marrow signal of uncertain cause through the cervical spine," "[s]table mild cord compression with moderate central stenosis at C3-C4 and C4-C5," "[l]eft-sided moderate/severe neural foraminal stenosis at C3-C4, C4-C5, and C5-C6," and noted "no significant change in appearance of the cervical spine from 7/16/2012." (AR 418-19.) The cervical MRI is noted indirectly through the ALJ's review of Dr. Helbig's examination conducted March 14, 2014, which relied upon the MRI. (AR 26, 495.)

throughout the ALJ's opinion, and discussed herein, the ALJ gave numerous and reasonable explanations for discounting Plaintiff's subjective complaints as a proper basis for Dr. Ereso's opinions.[3]

For these reasons, the Court finds the ALJ provided specific and legitimate reasons supported by substantial evidence in finding that Dr. Ereso's January 28, 2015 opinion should be given little weight.

2.    Dr. Ereso's Treatment Records from June through August of 2014

The ALJ reviewed multiple treatment records from Dr. Ereso that showed notations concerning Plaintiff taking care of her husband who had a stroke.  First the ALJ cited a June 10, 2014 treatment record that contained a notation that the Plaintiff was unable to work because of neck and back pain, however also included the statement that "she is taking care of her husband who had a stroke."  (AR 29, 449.)

Next, the ALJ cited a July 9, 2014 treatment record which noted that Plaintiff could not return to her prior occupation as a housekeeper or laundry worker "due to her neck and back problems, besides she is needed home to care for husband who had a stroke and insulin dependent diabetes and needs care 24/7."  (AR 29, 448.)  As to this record, Plaintiff argues that the ALJ "conveniently" left out the first part of the statement before "besides," which read "the patient is not able to go back to her occupation . . . due to her neck and back problems."  (Pl. Br. at 15.)  Plaintiff contends this was the "strongest evidence the ALJ cited for the proposition that Dr. Ereso was making capacity assessments based on his pity for Plaintiff, and not the detailed and severe imaging he had access to."  (Pl. Br. at 15.)

The Plaintiff's characterization of the ALJ's opinion in this regard is incorrect.  While the ALJ may not have quoted Dr. Ereso's statement before the word "besides," the ALJ paraphrased the two treatment records by writing that the June 10, 2014 treatment record "contained the notation that the claimant was unable to work due to pain in her neck and lower back, but concluded with the statement 'she is taking care of her husband who had a stroke,' " and "the

---

[3] Plaintiff has not mounted a challenge to any of the ALJ's findings concerning Plaintiff's credibility.  Therefore, Plaintiff has waived any challenge to the specific credibility findings by failing to raise them in her opening brief.  Warre v. Comm'r of Soc. Sec. Admin., 439 F.3d 1001, 1007 (9th Cir. 2006).

treatment record from July 9, 2014 stated that the claimant could not return to her prior occupation as a Housekeeper or Laundry Worker, and continued 'besides, she is needed home to care for husband who had a stroke.' " (AR 29.) The ALJ did not ignore the fact that Dr. Ereso opined that Plaintiff could not return to her prior occupation due to her ailments, but rather emphasized that while the medical evidence supported the determination that Plaintiff could not return to her prior occupation, the fact that she was assisting with the taking care of her husband suggested she could still do other work in the economy. The ALJ then cited to the July 9 record and an additional August 19, 2014 record from Dr. Ereso that also contained a notation concerning Plaintiff taking care of her husband:

> If the claimant had the ability to take care of her spouse, she would reasonably have had the ability to perform some basic work activities. The doctor's comments on July 9, 2014 suggest that he was sympathetic to the claimant's home situation, which is understandable, but not a basis for finding her disabled or unable to work. The fact that she could not return to her prior occupations is completely consistent with the findings herein, that she is unable to perform her past relevant work as opined by the Vocational Expert, discussed below. It is significant that the doctor stated on July 9, 2014 that the claimant could not return to prior work, but did not state that she was precluded from all work activity. Dr. Ereso's function by function capacity was for a slightly reduced range of light work with no postural, manipulative, or other nonexertional physical limitations. There is little medical evidence to support the subjective opinions that the claimant needed frequent breaks, would be absent three or four times a month, or could not complete an eight hour workday five days a week. A treatment record from August 19, 2014 stated that the claimant was 'busy taking care of her husband, has no time to have PT on her neck and back, has not had lumbar epidural…' The treatment record continued that the claimant had lower back pain and neck pain "off and on" and she stated to the doctor that she was unable to work due to continued pain.

(AR 29.) The ALJ also noted that Dr. Ereso's August 19, 2014 report was "brief as in prior examinations, with normal gait, station and stability." (AR 29, 443-46.)

An ALJ can reject a treating physician's opinion for the specific and legitimate reason that such opinion is based on a claimant's "subjective complaints," that have been "properly discounted." Fair v. Bowen, 885 F.2d 597, 605 (1989). Here, the ALJ has specifically pointed to multiple instances where Dr. Ereso notes that Plaintiff provides assistance to her husband in relation to her inability to work, which provides further support for the ALJ's discounting of Dr. Ereso's opinions. Additional instances where Plaintiff noted her care for her husband within forms filled out directly by Plaintiff, and the Plaintiff's testimony concerning such, were also

1  cited by the ALJ as further support to the ALJ's opinion.  (AR 24-25, 57-60, 320-325.)

2        3.   Dr. Ereso's January 2015 Exam and RFC Questionnaire

3        The ALJ reviewed a January 27, 2015 treatment record issued by Dr. Ereso following an

4  in-person visit.  (AR 27, 469-70.)  The record showed that the Plaintiff visited for a regular

5  checkup and to fill out disability paper work.  (AR 469.)  Plaintiff reported joint and muscle pain,

6  specifically numbness, tingling and sharp cramping in legs, shoulder and neck pain on left side,

7  lower back pain, hip pain, and foot pain.  (AR 469.)  Dr. Ereso noted that Plaintiff cannot sit for

8  more than thirty continuous minutes, needs to stand and stretch, and cannot do overhead work

9  with arms due to pain in neck and numbness in left arm.  (AR 469.)  Again, Dr. Ereso noted

10  normal gait, station, and stability.  (AR 469.)

11        Concerning this record, the ALJ found it "significant to note that the record that date does

12  not show any Range of Motion (ROM) testing, neurological testing, or other office examination

13  procedures," and that "[t]he limited examination procedures do not support the limitations as

14  suggested by the claimant's doctor in" the RFC questionnaire issued the next day, January 28,

15  2015.  (AR 27.)

16        In the January 28, 2015 RFC questionnaire (AR 29, 457-58.),  Dr. Ereso opined that

17  Plaintiff could now only sit or stand/walk for twenty minutes at a time, that she could only sit

18  one hour and stand/walk one hour during an eight-hour work day, and would need a position

19  which permits shifting at will from standing, sitting, and walking (AR 457), whereas in the

20  previous RFC questionnaire Plaintiff could sit for forty-five minutes and stand for thirty minutes

21  at a time, and could sit five hours and stand/walk five hours during an eight-hour work day (AR

22  439-42).  Plaintiff could lift and carry ten pounds or less than ten pounds occasionally,[4] never lift

23  twenty pounds or more, and whereas the previous RFC questionnaire noted no limitations in

24  reaching, handling, and fingering (AR 439-42), Plaintiff now had limitations of 50% usage with

25  the right hand, 10% with the left hand, and limitation on arms for reaching of 20% bilaterally.

26  (AR 29, 457-58.)  The doctor also noted that Plaintiff could not work a full day five days a week

27  _____

28  [4] The ALJ incorrectly noted that the MSS stated Plaintiff could lift less than 10 pounds frequently, rather than occasionally.  (AR 29, 458.)

and would be absent three or four times a month.  (Id.)

The ALJ gave the January 28, 2015 opinion little weight:

> The findings checked are not supported by any reference to the treatment record or explanation, and there is no rationale provided as to why from May 2014 to January 2015 the claimant became substantially more limited.  At an appointment on January 27, 2015 the claimant discussed paperwork for her disability claim. She told the doctor she could not walk or stand more than 20 minutes, or sit for more than 30 minutes continuous, she needed to stand and stretch, and could not do overhead work.  The examination noted normal gait, station, and stability . . . The treatment record did not contain any recorded findings that supported the reduced exertional and non-exertional limitations, compared to the May 2014 assessment.

(AR 29.)  Again, the ALJ need not accept the opinion of any physician that is brief, conclusory, and unsupported by clinical findings, Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002), and can reject a treating physician's opinion for the specific and legitimate reason that such opinion is based on a claimant's "subjective complaints," that have been "properly discounted," Fair v. Bowen, 885 F.2d 597, 605 (1989).  The ALJ reasonably found no rationale in the record as to why the Plaintiff would be so substantially more limited from the time the May 2014 RFC questionnaire was completed.  (AR 439-42.)  The treatment records from June 10, 2014 (AR 449), July 9, 2014 (AR 448), and August 19, 2014 (AR 443-46), discussed in the previous section, do not reflect any objective analysis from Dr. Ereso that would support the changed assessment.  Of these three records from Dr. Ereso in this interim period, none demonstrate any objective findings that would support the changed assessment, and specifically, as to the physical exam portion of the exam records, only the August 29, 2014 record addresses the musculoskeletal factors of gait, station, and stability, with a finding of normal.  (AR 445-50.) Additionally, as noted above, the exam immediately preceding the RCF questionnaire conducted on January 27, 2015, showed no Range of Motion testing, neurological testing, or other office examination procedures.  (AR 27, 469-70.)

The Plaintiff did receive a lumbar MRI and a cervical MRI during the interim period between the two RFC questionnaires.  (AR 460-62, 492-93.)  The ALJ reviewed the October 29, 2014 lumbar MRI, stating that the it showed no significant changes compared to the December 28, 2013 lumbar MRI.  (AR 27, 492-93.)  This is accurate, as the Doctor's findings on the

lumbar MRI state the conditions "have not significantly changed when compared to the prior study." (AR 493.)

The previous cervical MRI dated December 28, 2013, showed a "[c]hronic diffusely abnormal marrow signal of uncertain cause through the cervical spine," "[s]table mild cord compression with moderate central stenosis at C3-C4 and C4-C5," and "[l]eft-sided moderate/severe neural foraminal stenosis at C3-C4, C4-C5, and C5-C6." (AR 367-68.) The October 29, 2014 cervical MRI showed disc protrusions at the C3-C4, C4-C5, C5-C6, C6-C7, C7-T1, and throughout the partially visualized upper thoracic spine, the disc protrusions at the C3-C4 and C4-C5 indent the ventral aspect of the spinal cord, and the disc protrusion at the C4-C5 level encroaches on the C5 nerve, with moderate to severe left neural foraminal stenosis "which has worsened when compared to the prior study." (AR 460-61.) The ALJ's assessment of the new cervical MRI only noted that the October 29, 2014 cervical MRI "showed the same protrusion at C4-C5, causing moderate to severe left neural foraminal stenosis . . . protrusions at C3-T1," and that no spinal abnormalities were found. (AR 27.)

While the October 2014 cervical MRI noted disc protrusions at C6-C7 and C7-T1 that were not noted on the previous cervical MRI, these only resulted in mild right neural foraminal stenosis. Additionally, while the October 2014 cervical MRI noted that the left neural foraminal stenosis worsened since the previous MRI, it remained at the moderate to severe level. The January 28, 2015 RFC questionnaire and the January 27, 2015 exam immediately prior (AR 457-58, 469-70), do not refer to these MRIs as a basis for Dr. Ereso's opined limitations. The minor changes in the objective MRI results obtained between Dr. Ereso's May 2014 and January 2015 RFC questionnaires do not require the ALJ to have found such records as supporting the drastic change in limitations between the two RFC questionnaires absent objective examination records to support the limitations.

For these reasons, the Court finds the ALJ provided specific and legitimate reasons supported by substantial evidence in finding that Dr. Ereso's January 28, 2015 opinion should be given little weight.

///

4.      Dr. Ereso's Treatment Records Dating October 2015 to April 2016

The ALJ briefly noted a series of progress evaluations from Dr. Ereso. First a record dated October 1, 2015 (AR 472-73), which the ALJ noted as indicating Plaintiff's reporting of back pain is intermittent, as the record reflected back pain "for the prior week only."[5] (AR 27.) The ALJ noted that the Straight Leg Raising test was negative, Plaintiff had normal station and gait,[6] with no lumbar tenderness, and the doctor recommended a heating pad for lower back pain. (AR 27, 473.)

Next, concerning a visit with Dr. Ereso on December 2, 2015, the ALJ noted that such record again reflected Plaintiff's reporting of joint/muscle pain, neck, left shoulder, and entire back pain, with occasional left arm numbness, along with non-migraine headaches, neck pain radiant on the left arm C5 distribution, and normal gait, station and stability. (AR 28, 474-75.) Plaintiff visited Dr. Ereso shortly thereafter on January 7, 2016, and the ALJ noted that "just a month later, the claimant reported feeling better," and that the "doctor diagnosed morbid obesity, thoracic or lumbosacral neuritis or radiculitis and recommended that the claimant lose weight by diet and exercise." (AR 28.) The Court notes that the "feeling better" appears to be in regards to symptoms of diarrhea and vomiting, not back or neck pain, as the record states that the reason for the visit is "C/O diarrhea, vomiting, tiredness, weakness, headache, [and] loss of appetite x2 days," and reports "[f]eeling better today, no more vomiting diarrhea, no BM today." (AR 470.)

The ALJ then reviewed a record concerning an examination by Dr. Ereso on April 11, 2016. (AR 28, 510-12.) Plaintiff reported left side neck pain radiating to the left arm, left leg numbness, and the ALJ noted that "[s]he told the doctor that these symptoms had existed for about a month, again suggesting that her pain symptoms were intermittent and not chronic." (AR 28.) The Court notes that the record specifically reads "C/O pain L side of neck radiating to L arm, L leg feels numb X1 month," and therefore it is not clear whether this notation refers to all symptoms, or just the numbness. (AR 510.) The ALJ also opined that Dr. Ereso requested a

---

[5] The treatment record states the reason for the visit is "C/O sharp pain in lower back X1 week, unable to stand for a long period of time," and notes "woke up with pain in lower back 1 week ago, feels like a cramp." (AR 472-73.)

[6] The record reflects a notation of normal station and stability, not gait. (AR 473.)

19

drug screening "as there were conflicting statements by the claimant as to the amount and frequency of medications she was taking [and] [t]he doctor stated that he would gradually wean her from oxycodone. (AR 28.) The Court notes that doctor's comment in the record specifically states that when he ordered drug screening, "she came to me saying that she has not taken her pain meds for 3 days due to UTI, before that she told me she has been taking her meds daily Will [sic] do drug screening and will gradually wean her oxycodone, will give her #150 this month." (AR 512.)

     5.   <u>Dr. Ereso's June 1, 2016 RFC Questionnaire</u>

Finally, the ALJ evaluated the RFC questionnaire completed June 1, 2016. (AR 29-30, 530-32.) In this record, Dr. Ereso limited lifting and carrying to twenty pounds occasionally and ten or less pounds frequently, an improvement over the previous January 28, 2015 RFC questionnaire of never carrying twenty pounds and only occasionally ten pounds or less (AR 458), and the previous May 9, 2014 RFC questionnaire which only allowed ten less than ten pounds frequently, and ten or twenty pounds occasionally (AR 440). The June 2016 questionnaire limited sitting to four hours and standing/walk to four hours in a work day (AR 530), a dramatic improvement over the prior January 2015 questionnaire which had limited such activities to only one hour (AR 457). The amount of time Plaintiff can sit or stand walk at one time also improved from twenty to thirty minutes compared to the previous January 2015 questionnaire. (AR 457, 530.)

The new questionnaire stated Plaintiff requires the ability to shift positions at will, and would need unscheduled rest breaks every two hours for twenty minutes. (AR 530-31.) The doctor checked "no" as to manipulative limitations, however this appears to be a mistake as he wrote that Plaintiff could use her right hand 60% and left hand 50% during a workday, and use bilateral arms 50% of the workday. (AR 531.) This is a significant improvement from the limitations noted on the previous January 2015 questionnaire which limited Plaintiff to 50% for the right hand, 10% for the left hand, and 20% for the bilateral arms, (AR 458), and worse than the original May 2014 questionnaire which had no such limitations at all (AR 440). The Doctor also noted that Plaintiff would be absent once or twice a month as a result of impairments and

treatments and would not able to work an eight-hour workday five days a week on a sustained basis. The Doctor also concluded that these limitations existed at this level since 2015, but does not specify a month. (AR 532.)

Following review of the last RFC questionnaire, the ALJ provided an analysis of why he gave this RFC questionnaire reduced weight, in conjunction with his overall analysis of Dr. Ereso's opinions as a whole:

> The undersigned gives reduced weight to the non-exertional limitations suggested by the doctor. There was again no explanation or reference to treatment records to support the sitting, standing, and walking limitations, and no explanation what would limit the claimant to 50% use of her hands and arms. Except for the exertional limitations, the non-exertional limitations are not explained or supported by the treatment record. On May 10, 2016 the claimant received an Epidural Steroid Injection (ESI) at L2-3, and was advised to limit her activity for four days, then she could resume normal activity [Exhibit 18F]. At an earlier appointment on April 11, 2016, Dr. Ereso noted limited Range of Motion (ROM) on the left shoulder, and advised the claimant to increase Range of Motion exercises, especially her left shoulder [Exhibit 15F5]. The treatment records do not support the extent of limitations suggested.
>
> The treating doctor's opinions as to exertional capability started at light, went to sedentary, then returned to light. However, there are no corresponding or contemporaneous treatment records that suggest that the claimant's condition worsened around the January 2015 evaluation and then improved by June 2016. Her condition as described and noted in the treatment record has remained relatively unchanged during the period of adjudication. The doctor's opinions do not point to specific objective findings or clinical observations or reference treatment records, and there is no adequate explanation of basis for opinions. Contemporaneous treatment records do not support the suggested limitations. The majority of musculoskeletal examination findings were simply mention [sic] gait, station, and stability, with few findings to support the non-exertional limitations as suggested. Manipulative limitations suggested are not supported by medical evidence. The absence of postural limitations is unusual, as it would be reasonable to find that a person with cervical and lumbar degenerative disc disease, with radiating symptoms, would have some limitation in postural activities. Also, the doctor never mentions the need for use of a cane or other assistive device as alleged by the claimant.

(AR 30-31.) The ALJ's finding that there are no treatment records supporting the changes in the limitations expressed in the June 2016 RFC questionnaire as compared to the previous two questionnaires are supported by the exam records. A March 26, 2015 exam shows no musculoskeletal physical exam. (AR 478.) A June 24, 2015 exam shows no musculoskeletal physical exam. (AR 477.) An August 26, 2015 exam only noted normal gait, station, and stability under the physical musculoskeletal exam. (AR 480.) An October 1, 2015 exam noted

normal station and stability, a straight-leg raising test showed 90 degrees bilaterally, and noted no lumbar tenderness.  (AR 473.)  A December 2, 2015 exam only noted normal gait, station, and stability under the musculoskeletal physical exam.  (AR 475.)  An exam conducted January 7, 2016, shows no musculoskeletal notes from a physical exam.  (AR 471.)  A February 9, 2016 exam only noted a straight leg raising test at 90 degrees bilaterally with lower back pain.  (AR 515.)  A March 22, 2016 exam shows no musculoskeletal physical exam notes.  (AR 513.)

The June 2016 questionnaire limited sitting to four hours and standing/walk to four hours in a work day (AR 530), and none of these records support such a dramatic improvement over the prior January 2015 questionnaire which had limited such activities to only one hour (AR 457).  As noted by the ALJ, the April 11, 2016 physical exam did note under musculoskeletal that Plaintiff had limited range of motion, especially in the left shoulder and advised patient to increase ROM exercises.  (AR 511.)  This, nor other records in the time period, explain why the June 2016 questionnaire provided that Plaintiff could use her right hand 60% and left hand 50% during a workday, and use bilateral arms 50% of the workday (AR 531), a significant improvement from the limitations noted on the previous January 2015 questionnaire which limited Plaintiff to 50% for the right hand, 10% for the left hand, and 20% for the bilateral arms (AR 458).

Finally, after a referral from Dr. Ereso, Plaintiff obtained an additional lumbar MRI on March 16, 2016.  (AR 503-505.)  The MRI noted disc protrusions at L3-L4 and L5, moderate to severe disc height loss and Modic Type I-II endplate degenerative changes at L4-L5, and moderate facet arthropathy at L5-S1.  (AR 505.)  An addendum to this MRI noted "left extraforaminal and far later extension at L3-L4, newly impinging the left L3 exiting nerve root . . . contacting the left L3 exiting nerve root."  (AR 503, emphasis added.)  In evaluating this report, the ALJ noted that "[t]his new study indicates some increase in degenerative changes, but the medical evidence does not suggest any new or additional limitations in the claimant's ability to function."  This MRI was not cited by Dr. Ereso in the examination conducted on April 11, 2016, nor in the June 1, 2016 RFC questionnaire.  It does not appear to alter the appropriateness of the ALJ's findings concerning the June 1, 2016 RFC questionnaire, given that Plaintiff's limitations

1  actually improved from the previous RFC questionnaire from January of 2015. (AR 457-58,

2  530-31.)

3     The ALJ reasonably found that the major change in limitations opined by Dr. Ereso were

4  not supported by any objective findings reported in the questionnaire, and the ALJ need not

5  accept the opinion of any physician that is brief, conclusory, and unsupported by clinical

6  findings. Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002). For these reasons, the Court

7  finds the ALJ provided specific and legitimate reasons supported by substantial evidence

8  supports in finding that Dr. Ereso's June 1, 2016 RFC opinion should be given little weight.

9     **C.    The ALJ Erred in Assigning Great Weight to Agency Physicians**

10     State agency physicians opined as to Plaintiff's residual functional capacity on June 19,

11  2014 (AR 121-142), and October 13, 2014 (AR 143-164). The ALJ explained why he gave the

12  state agency physicians opinions great weight:

13
> The doctors provided a detailed summary of the treatment record, including the
> subjective statements of the claimant as to the severity of her symptoms . . . The
14
> undersigned gives great weight to this opinion. The summaries contained detailed
> and thorough annotations of allegations and treatment records, and gave greater
15
> specificity in determining the claimant's function by function limitations. The
> non examining doctors found postural limitations, whereas the treating doctor did
16
> not indicate any. Also they provided limitations in overhead reaching, taking into
> consideration neck and shoulder pain as alleged by the claimant. The residual
17
> functional capacity conclusions reached by the agency reviewing doctors are as a
> general matter given less weight than opinions from an examining or treating
18
> physician. In this claim, greater weight is given to the State agency opinions, as
> there are considerable unexplained inconsistencies in the opinions from the
19
> treating doctor.

20  (AR 31.) However, as described previously herein, Plaintiff had subsequent lumbar and cervical

21  MRIs conducted on October 29, 2014 (AR 460-62, 492-93), and an additional lumbar MRI on

22  March 16, 2016 (AR 503-505). Additionally, Dr. Ereso's exam notes dated April 11, 2016, also

23  showed new limited range of motion testing and greater limitation particularly in the shoulder,

24  following a physical exam. (AR 510-12.) Although this evidence was considered by the ALJ

25  (AR 27-28), this exam record and the two most recent MRIs were not reviewed by the state

26  agency physicians, and thus, there is no state medical opinion addressing Plaintiff's residual

27  functional capacity after reviewing these records. As discussed previously, although these

28  records do not demonstrate the ALJ erred in assigning little weight to Dr. Ereso's opinions, it

was error to give great weight to the state agency physicians' RFC determinations when they did not have access to these most recent records. The most recent MRIs may show additional limitations greater than demonstrated by the objective evidence available to the state physicians at the time of their review.

Plaintiff seeks to have the Court remand for an award of benefits. The Ninth Circuit has "devised a three-part credit-as-true standard, each part of which must be satisfied in order for a court to remand to an ALJ with instructions to calculate and award benefits: (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand." Garrison v. Colvin, 759 F.3d 995, 1020 (9th Cir. 2014). The credit as true doctrine allows "flexibility" which "is properly understood as requiring courts to remand for further proceedings when, even though all conditions of the credit-as-true rule are satisfied, an evaluation of the record as a whole creates serious doubt that a claimant is, in fact, disabled. Garrison, 759 F.3d at 1021.

The Court finds that review of the record raises serious doubts that Plaintiff is in fact disabled due to her physical impairments. Here, the ALJ relied on the opinions of the agency physicians in developing the residual functional capacity assessment. However, no physician opined on Plaintiff's physical abilities following the most recent test results and there is no opinion remaining in the record that addresses Plaintiff's physical abilities based on the recent testing and objective findings. Further administrative proceedings would be useful for a physician to consider the new MRI results in determining Plaintiff's residual functional capacity. Upon remand the ALJ shall obtain additional medical opinion evidence as to Plaintiff's physical functioning from a consultative examiner or a medical expert, and further develop the record as deemed necessary.

///

///

///

## V.

## CONCLUSION AND RECOMMENDATION

Based on the foregoing, the Court finds that the ALJ did not err in assigning little weight to the opinions of treating physician Dr. Ereso, however finds that because the ALJ erred in assigning great weight to the state agency physician opinions, substantial evidence does not support the residual functional capacity determination and therefore this action should be remanded for further administrative proceedings. Accordingly, IT IS HEREBY RECOMMENDED that Plaintiff's appeal from the decision of the Commissioner of Social Security be granted.

These findings and recommendations are submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304. Within fourteen (14) days of service of this recommendation, any party may file written objections to these findings and recommendations with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated: __February 4, 2019__

_____
UNITED STATES MAGISTRATE JUDGE